503 F.2d 376
 Richard L. NELSON, Captain Green Post No. 20, American
Legion, and Prosser Bowling, Inc., Plaintiffs-Appellants,
v.
BRUNSWICK CORPORATION, Defendant-Appellee.
Gerald L. GALLIHER, Plaintiff-Appellant,
v.
BRUNSWICK CORPORATION, Defendant-Appellee.
 Nos. 71-2695 and 71-2696.
 United States Court of Appeals, Ninth Circuit.
 Aug. 8, 1974.
 
 James P. Connelly (argued), Winston, Cashatt, Repsold, McNichols, Connelly & Driscoll, Spokane, Wash., for plaintiffs-appellants.
 Dean W. Loney (argued), Loney, Westland & Raekes, Kennewick, Wash., for defendant-appellee.
 Before KOELSCH and TRASK, Circuit Judges, and JAMESON,* District judge.
 OPINION
 KOELSCH, Circuit Judge:
 
 
 1
 The claims involved in these appeals are for personal injuries and property damage resulting from an explosion in a building in Prosser, Washington.[1] Plaintiffs are Captain Green Post No. 20, American Legion, a corporation (Legion), owner of the building; Prosser Bowling, Inc. (Prosser), Legion's lessee and the operator of a bowling alley in the building; Richard L. Nelson, manager of the bowling alley; and Gerald L. Galliher, an acquaintance of Nelson. Defendant is the Brunswick Corporation.
 
 
 2
 The accident occurred within a few hours after Brunswick, pursuant to an agreement with Prosser, had completed resanding and refinishing the bowling lanes and left the premises. Nelson, accompanied by Galliher, had entered the building. The air was heavily laden with fumes given off by the still-drying lacquer, and Nelson was about to show Galliher the wires for some electrical appliances which would have to be replaced before the lanes would be ready for use. As Nelson started to raise the wires, there was an arc, followed instantly by a violent explosion; the building was wrecked, and Nelson and Galliher suffered severe personal injuries. The claims were consolidated for trial, and trial was had to a jury which rendered verdicts against all plaintiffs. The matter is here on their several appeals from the ensuing judgments.
 
 
 3
 Legion, Prosser and Nelson have filed a joint brief. Galliher has filed a separate one. We will consider the appeals of Legion, Prosser and Nelson together and treat galliher's separately.
 
 
 4
 1. The Appeals of Legion, Prosser and Nelson
 
 A. The warning contentions
 
 5
 Plaintiffs predicated recovery upon two separate theories-- strict liability for a defective product and ordinary negligence.[2] Strict liability was rested wholly upon Brunswick's alleged failure to give adequate warning of the inherent dangers in the refinishing lacquer; this same failure was also charged as one of several acts of negligence.[3] The trial court refused plaintiffs' instructions concerning warning; the result was to eliminate from the jury's consideration the strict liability theory and that asserted act of negligence. We are clear these rulings were correct.
 
 
 6
 As indicated, plaintiffs did not contend that the lacquer was defective per se; rather they urged that it was made defective because not accompanied with an adequate warning to make it reasonably safe for the intended use. The Supreme Court of Washington has adopted the rule of 402A of the Restatement of Torts, Second, which makes liable in damages 'one who sells any product in a defective condition unreasonably dangerous to the user . . .' for the injuries caused by such product. Ulmer v. Ford Motor Co., 75 Wash.2d 522, 452 P.2d 729 (1969). Although that Court has not had occasion to decide whether the rule includes properly manufactured products that are unaccompanied by an adequate warning, the developing national trend appears to favor this broad application,[4] and we will assume that Washington is in accord.[5] However, the defect which makes the product 'unreasonably dangerous' and allows the imposition of liability without proof of fault must itself be the actual cause of injury.[6] Cf. Davis v. Wyeth Laboratories,399 F.2d 121, 131 and 131 n. 20 (9th Cir. 1968). See Frumer and Friedman, Products Liability 11.04(3), at 219. Thus, if despite a deficient warning the user is fully aware of the danger of which a reasonable warning should apprise him, then the deficiency is not a cause of the ensuing accident.
 
 
 7
 The record in this case establishes as a matter of law that Brunswick's failure to warn was not the actual cause of the explosion.[7] On cross-examination Nelson testified at length regarding his awareness of the danger and its magnitude; he frankly admitted knowledge that the fumes given off by the drying lacquer were highly explosive and that they were readily susceptible of detonation by a spark or a lighted match. His testimony makes manifest the conclusion that he knew all that an adequate warning would tell him and that a cause of the explosion was not his lack of appreciation of the danger.[8]
 
 B. The prior explosions and fires
 
 8
 Plaintiffs assign as error the court's ruling excluding from evidence proof that a number of explosions and fires had occurred elsewhere during other Brunswick resurfacing operations. Such evidence was, of course, irrelevant and therefore inadmissible to show that Brunswick was negligent in the performance of this particular work. However, in Washington (Turner v. Tacoma, 72 Wash.2d 1029, 435 P.2d 927 (1967)), as elsewhere, such proof is sometimes admitted to show a defendant had notice of the danger and to demonstrate the magnitude of the danger, the latter fact being helpful in gauging the amount of care to be exercised in the circumstances. McCormick, Evidence 473 (2d ed. 1972); Frumer and Friedman, supra, 12.01(2) at 232; Prosser, The Law of Torts 673 (4th ed. 1971). But whether to admit such evidence is a matter generally for the trial court to decide, keeping in mind the collateral nature of the proof, the danger that it may afford a basis for improper inferences, the likelihood that it may cause confusion or operate to unfairly prejudice the party against whom it is directed and that it may be cumulative, etc. McCormick, supra, at 473. Here the probative value of the proposed proof was slight. It related to a limited issue which Brunswick had in large part conceded, and it was cumulative to testimony actually adduced. We cannot conclude that the trial court erred in rejecting it.
 
 
 9
 C. The disregard of Prosser's corporate entity
 
 
 10
 The court by one of its instructions directed the jury to apply Brunswick's defense of Nelson's contributory negligence not only to Prosser but also to Legion. This was error. And because the jury may have found both Brunswick and Nelson guilty of negligence which was a proximate cause of the accident, the error was prejudicial to Legion and requires a reversal of that judgment.
 
 
 11
 In J. I. Case Credit Corp. v. Stark, 64 Wash.2d 470, 392 P.2d 215 (1964), the Supreme Court of Washington reiterated the holding in earlier decisions[9] that a court may not 'pierce the corporate veil' to declare two corporations identical in responsibility unless the record establishes not only 'such a commingling of property rights or interests as to render it apparent that they are intended to function as one,' but also, that, 'to regard them as separate would aid the consummation of a fraud or wrong upon others.' 392 P.2d at 218.[10] We entertain grave doubt that the proof concerning the property interests and affairs of Prosser showed a sufficient commingling to meet the identity of interest requirement.[11] However, that problem aside, we nevertheless are clear that the injustice requirement is not met: to regard Prosser and Legion as separate would not 'aid in the consummation of a fraud or wrong upon' Brunswick. We accept Brunswick's proposition that a 'fraud or wrong upon others' is simply the violation of a legal duty owed the party seeking to have the intervening corporation disregarded (see Horowitz, Disregarding the Entity of Private Corporations, 14 Wash.L.Rev. 285, 294 (1940) and that all that need appear to trigger the doctrine of disregard is the existence of a duty and its avoidance. However, the duty hurdle is insurmountable. Prosser, not Legion, was Nelson's employer, and Legion neither supervised nor otherwise directed or controlled Nelson's activities. Thus Nelson's negligence, if such there was, could not be imputed to Legion.
 
 2. The Appeal of Galliher
 
 12
 The errors assigned by Galliher are, for the most part, the same as those commonly assigned by Legion, Prosser and Nelson. None of them has merit, as we have stated above. Of the remainder, only the one that relates to the giving of an instruction on the doctrine of voluntary assumption is properly before us; and we will limit our review to it.
 
 
 13
 Following the entry of judgment and while Galliher's appeal was pending, the Supreme Court of Washington abolished the use of the doctrine of assumed risk as a defense when the defense of contributory negligence can be raised. Lyons v. Redding Construction Co., 83 Wash.2d 86, 515 P.2d 821 (1973). We are required, in exercising our appellate jurisdiction over this diversity case, to apply the law as presently defined by the highest court of Washington, despite the fact that the law was altered after the judgment below was entered. Vandenbark v. Owens-Illinois Glass Co., 311 U.S. 538, 61 S.Ct. 347, 85 L.Ed. 327 (1941); Alameda County v. United States, 124 F.2d 611 (1941). See 1a J. Moore, Federal Practice P0.307(3), at 3317 (2d ed. 1961). We are compelled to hold the giving of the instruction error.[12] And because the jury may have concluded that Galliher assumed the risk of injury by entering the fume-filled building and based its adverse verdict upon that finding, the error was prejudicial, and the judgment in his case must be reversed.
 
 
 14
 Moreover, Lyons aside, the instruction, although a correct statement of law, was abstract,[13] and its giving constituted reversible error. Albin v. The National Bank of Commerce of Seattle, 60 Wash.2d 745, 375 P.2d 487 (1962).
 
 
 15
 In most if not all cases in which the defense of assumption of risk is applied, the injured plaintiff will not know until after he has been injured the precise path of events by which a known risk is increased to a certain injury. 'Thus, saying that one 'fully appreciated a risk' makes sense only in relative terms; it is a way of saying that his understanding of the probability of harm was at least as good as would be achieved from some point of view chosen as a standard for judgment.' Keeton, Assumption of Risk in Products Liability Cases, 22 La.L.Rev. 122, 125 (1961). The problem is to decide whether to select appreciation of the greater or lesser risk faced by Galliher as the 'standard for judgment.'
 
 
 16
 Washington cases, and the policy behind the assumption of risk defense, require that the particularized risk created by the live wires be used as the focal point for testing the legal sufficiency of Galliher's knowledge.
 
 
 17
 Washington law interpreting assumption of risk distinguished between the generalized risk of undertaking an activity and additional extraordinary risk, requiring that before an assumption instruction be given some evidence indicate that the plaintiff was aware of the 'extraordinary' risk. In Hogenson v. Service Armament Co., 77 Wash.2d 209, 461 P.2d 311, 315 (1969), the court held that a plaintiff whose eye was injured by defective ammunition bought from defendant had not assumed the risk of being injured by the ammunition simply because he was aware of the risk of firing antique rifles. The court stated:
 
 
 18
 'In the instant case the plaintiff may well be held to have been aware of a generalized hazard involved in firing old guns. There was no evidence indicating that he was aware of the further specific hazard of firing cartridges of the age and condition involved. Had he been aware of this risk he may well have reevaluated his decision to engage in target practicing on the day in question . . . When there was no evidence introduced that the plaintiff was aware of the factors leading to the 'extraordinary risk,' a volenti instruction would be singularly inappropriate.' 461 P.2d at 315.
 
 
 19
 And in Regan v. Seattle, 76 Wash.2d 501, 458 P.2d 12 (1969), the court held that a go-cart driver, even though aware of the risk of injury from racing, did not assume the risk of an accident created by water on the track, which defendant had negligently failed to remove, unless plaintiff had knowledge of the extraordinary risk. (See also Fred Harvey Corp. v. Mateas, 170 F.2d 612 (9th Cir. 1948); and generally, Prosser, supra, at 447-449.)
 
 
 20
 The additional risk created by the energized electric wires was an 'extraordinary risk' as that term is used in Regan and Hogenson. The court in Hogenson suggests one factor to be considered in determining whether the risk is extraordinary-- whether the additional risk is sufficiently distinct from the risk of which the plaintiff is aware to cause his reconsideration of entry into the dangerous activity. The presence of the live, bare wires substantially altered the risk of entering the building by creating an unperceived potential source of ignition.
 
 
 21
 Moreover, as in Regan and Hogenson, while the generalized risk which the plaintiff appreciated and voluntarily confronted was not attributable to the fault of Brunswick, the latter's negligence created an additional hidden risk which altered the perceived risk, and hence was 'extraordinary.' Galliher's case, it must be remembered, did not go to the jury on a products liability theory-- Brunswick was not chargeable with creating the risk of a fume-filled building. Rather, Brunswick was allegedly negligent in inadvertently turning on the power to the wires. Thus, while Galliher's injury foreseeably occurred, as did those in Regan and Hogenson, from the risk which made the known activity dangerous-- go-carts crash, old guns misfire, and fume-filled buildings explode-- nevertheless assumption of the risk is inapplicable because Brunswick's negligence created a hidden danger which increased the probability that the known risk would result in injury.
 
 
 22
 Requiring proof that Galliher knew of the 'extraordinary' risk accords with the policy of the doctrine. Indeed, allowing the defense without proof of knowledge of the additional risk created by Brunswick's negligence is inconsistent with the rationale for allowing assumption of risk to operate as a defense beyond the scope of contributory negligence.
 
 
 23
 In the ordinary situation in which assumption of risk is applied, the plaintiff sees a dangerous situation created by defendant's negligence and, knowing the risk, undertakes to confront it. If he is injured, and the decision to confront the danger was unreasonable (as Galliher's decision to enter the building may have been), then the plaintiff will be precluded from recovery by his contributory negligence. However, even if the decision was reasonable, he is still held to have assumed the risk of his injury. Whether the result is explained in terms of extinguishment of the defendant's duty of care to the particular plaintiff, or in terms of a break in the chain of proximate causation, see Walsh v. West Coast Coal Mines, 31 Wash.2d 396, 197 P.2d 233 (1948), the rationale is essentially that when the plaintiff knows and appreciates the danger, he is in a position as good as the defendant's to avoid his injury. If the plaintiff reasonably wishes to risk injury in order to derive some sufficiently important benefit, the law assigns him, rather than the defendant, the costs if he does not make it unscathed. The rule is justified because it reduces accidents-- by refusing to transfer the costs of the accident from the faultless plaintiff to the negligent defendant, the law creates an incentive for the plaintiff to avoid even reasonable risks.
 
 
 24
 The policy of assigning the cost of a risk-encountering enterprise to one who chooses to embark on it conflicts with the general tort policy of fault liability, which seeks to compensate those injured through the fault of others. See Mansfield, Informed Choice in the Law of Torts, 22 La.L.Rev. 17, 23-25 (1961). We think that when, as here, the defendant's negligence has increased the risk which plaintiff can observe, the policy behind assumption of risk becomes inapplicable and the doctrine must yield. The hidden risk necessarily causes the plaintiff to underestimate the cost of proceeding, thereby biasing his decisions towards activity with a greater potential for accidents than he would consciously undertake. On the other hand, the defendant retains a superior capacity to avoid the accident because he is chargeable with knowledge of the additional risk. The assumption of risk defense, rather than providing an additional incentive to the plaintiff to avoid the risk, increases the chances for accidents by removing the defendant's incentive to avoid adding hidden to apparent risks, and correcting or warning of those created. As a result, the accident-reducing function of the defense is not served by its availability in this situation, and the defendant should be relegated to his defense of contributory negligence.
 
 
 25
 We conclude that both under Washington law and general tort principles the defense of assumption of risk is properly limited to those situations in which the plaintiff 'in fact understood the risk to himself and his property as well as the defendant should have understood it.' Keeton, supra, at 125. To repeat: As Galliher did not know that the wires were charged, and Brunswick allegedly should have, the instruction should not have been given.
 
 
 26
 In summary, the judgments against Prosser and Nelson are affirmed; those against Legion and Galliher are reversed. The latter two causes are remanded with instructions to grant a new trial. No costs allowed in No. 71-2695. Costs to appellant in No. 71-2696.
 
 
 
 *
 The Honorable William J. Jameson, United States District Judge for the District of Montana, sitting by designation
 
 
 [1]
 Plaintiffs invoked the diversity jurisdiction of the district court (28 U.S.C. 1332(a)(1)). Washington law applies
 
 
 [2]
 In Washington a manufacturer can be liable under the common law for a negligent failure to give an adequate warning of danger. E.g., Callahan v. Keystone Fireworks Mfg., 72 Wash.2d 823, 435 P.2d 626 (1967). And a Washington safety statute imposes a duty upon a manufacturer that containers of explosive substances be suitably labelled. See Panther Oil & Grease Mfg. Co. v. Segerstrom, 224 F.2d 216 (9th Cir. 1955)
 
 
 [3]
 Another was Brunswick's resetting of an electrical circuit breaker; Nelson testified he had tripped the circuit breaker prior to Brunswick's entry upon the premises in order to deactivate the electrical system and permit him to remove some electrical fixtures which would otherwise interfere with the resurfacing work
 
 
 [4]
 See Jackson v. Coast Paint & Lacquer Co., 499 F.2d 809 (9th Cir., 1974); Davis v. Wyeth Laboratories, 399 F.2d 122 (9th Cir. 1968); Sills v. Massey-Ferguson, Inc., 296 F.Supp. 776 (N.D.Ind.1969); Casetta v. United States Rubber Co., 260 Cal.App.2d 792, 67 Cal.Rptr. 645 (1968); Crane v. Sears Roebuck & Co., 218 Cal.2d 855, 32 Cal.Rptr. 754 (1963); Frumer & Friedman, Products Liability 16A (4) (e), at 3-324 et seq., 1973 Supp. at 74; Prosser, The Law of Torts 660 (4th ed. 1971); Wade, Strict Liability of Manufacturers, 19 Sw.L.J. 5, 17 (1965)
 
 
 [5]
 At least one intermediate appellate court of that State has intimated approval. Simmons v. Koeteeuw, 5 Wash.App. 572, 489 P.2d 364 (1971)
 
 
 [6]
 The situation is analogous to other strict liability doctrines, such as liablity for injury caused by an ultra-hazardous activity. If the injury is not caused by that aspect of the activity which makes it ultra-hazardous, the injured person is relegated to any recovery he can obtain based upon proof of fault
 
 
 [7]
 We assume inadequacy for illustrative purposes only and intimate no view as to the fact. Because the adequacy of a warning requires a weighing of the gravity of the peril and the probability of its occurrence, the question is usually one to be answered by the fact finder. However, in this case we are at or very near the point where reasonable men could not doubt that Brunswick's warnings were adequate. For example, Brunswick employed a device, in its written safety check list which it gave Nelson, to insure that the warning would be brought to his attention before the work was commenced and that due precautions would be taken. And the containers themselves carried printed warnings. However, because there was evidence that Brunswick's employees may have contradicted some of the items in the list, thereby diluting the force of the warning, we prefer to rest our disposition on the lack of causation
 
 
 [8]
 This same lack of causation applies equally to a claim based upon negligence and supports the court's ruling eliminating from the jury's consideration Brunswick's failure to warn as an act of negligence
 
 
 [9]
 In Sommer v. Yakima Motor Coach Co., 174 Wash. 638, 26 P.2d 92, 98 (1933), it was said that:
 'Two corporations may not only transact business with each other, but they may perfect such arrangements, if fairly done, as will work to their mutual advantage. The mere fact of intimacy and harmony of relationship between them, or the ownership by one of a controlling interest in the other, does not of itself destroy their separate identities, nor does it merge them into a single entity. They are not to be adjudged as one, in legal effect, unless their property rights and interests are so closely commingled and related as to render it apparent that they are intended to function as one, and to regard them as separate would aid the consummation of a fraud or wrong upon others. This is the declared doctrine obtaining in this state.'
 
 
 [10]
 The question of whether to disregard a corporate entity under Washington Law is one for the court to decide. Sommer v. Yakima Motor Coach Co., 174 Wash. 638, 26 P.2d 92 (1933)
 
 
 [11]
 The evidence was to the effect that Legion had constructed the building to serve as a clubroom and meeting facility and to house a twelve-lane bowling alley. During construction the committee of Legion members (Legion Lanes) which was to manage the bowling alley learned that the Bowling Proprietors Assn. of America would not franchise an alley operated by a nonprofit association. To obtain the desired sanction, Prosser was incorporated. Its stock was entitely held by members of Legion Lanes. At the time of the explosion, Prosser had continuously managed and operated the bowling alley for more than ten years and had leased that portion of the building from Legion. Responsibility for the day-to-day operations of the alley was vested in Prosser's president. Prosser maintained checking accounts and did business in its own name. Brunswick contracted with Prosser both for the original purchase of the bowling alley equipment and for the resurfacing operation. Legion had no part in hiring and discharging Prosser employees. Nelson was hired by Prosser's president and paid by Prosser. Legion did not participate in the management of the bowling alley or in the supervision of Prosser employees. Operating decisions were made entirely by Prosser without consulting Legion. For example, when deciding whether to have the lanes resurfaced, Nelson consulted Prosser's president, and together they decided to incur the expense. Legion took no part in the decision, and nowhere in the record does it appear that Legion was aware that the lanes were being resurfaced
 
 
 [12]
 At the time the Vandenbark rule was adopted, it was undoubtedly thought to be a necessary extension of the Court's interpretation of the Rules of Decision Act in Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The rule has been criticized, see Moore, supra, at 3317, we think perhaps justly, because it can lead to a difference in the result obtained in a federal and state court. In a state which engages in prospective overruling, the federal appellate court's application of the new rule will lead to a different result than would have resulted in a case pending in the state appellate courts if the new rule were not applied retroactively. The Vandenbark decision does not on its face seem to contemplate an independent determination of whether the state will apply a change in its rules of decision retroactively in ascertaining the law of a state; we apply Vandenbark as a 'hard-and-fast' rule here. However, we do not think any difference would result from a more flexible approach, as our analysis of the Washington decisions indicates that Washington would probably apply this decision retroactively. In particular, in deciding to overrule a decision prospectively only, the Washington courts have stressed the importance of reliance interests founded on the law the be overruled. See State ex rel. Washington State Finance Committee v. Martin, 62 Wash.2d 645, 384 P.2d 833 (1963). There was no such reliance here on the availability of the assumption of risk defense. Cf. Baffin Land Corp. v. Monticello Motor Inn, Inc., 70 Wash.2d 893, 425 P.2d 623 (1967); Pacific States Cut Stone Company v. Goble, 70 Wash.2d 907, 425 P.2d 631 (1967)
 
 
 [13]
 Substantial evidence was adduced to show that when Galliher entered the building he was aware that the fumes were potentially explosive. However, there is no proof tending to show that he knew of the additional risk created by the presence of electrical current in the bare wires